CAMPBELL, Judge.
Appellant, the State of Florida, appeals the trial court’s order granting the motion to dismiss filed by appellee, Excilia Duque, pursuant to Florida Rule of Criminal Procedure 3.190(c)(4). The information dismissed by the trial court charged appellee with solicitation to commit the murder of her former husband, Louis Angel Duque, in violation of section 777.04(2), Florida Statutes (1982). We reverse.
Louis Angel Duque was murdered on September 9, 1982. Tammy Ann Duque, the daughter of appellee and appellee’s deceased former husband, and Stanley Smith, were both indicted for murder in the first degree in regard to the death of Mr. Du-que. Subsequently, Smith agreed to become a witness for the state.
In support of her motion to dismiss, ap-pellee attached a statement of facts as an “Exhibit ‘A’ ” to the motion. Appellant did not traverse, but relied on the same statement of facts to support its prima facie case.
Those portions of Exhibit “A” essential to our determination are set forth as follows:
EXHIBIT “A”
The facts upon which this motion is based have been taken from various sources. The key witnesses for the State are Stanley Smith, Anthony Huffman and Sandra Fields. They have all testified at deposition and at the trial of Tammy Ann Duque. The facts as established are as follows:
5. Stanley Smith first met Tammy Duque and Excilia Duque during the summer of 1982, when he and Anthony Huffman went to the Duque residence to *760 work upon an automobile owned by the Duque family.
6. Thereafter, Smith and Huffman visited the Duque residence regularly, both to work on the Duque cars and as friends.
7. A romantic relationship evolved between Huffman and Tammy Duque.
8. What has been described as a flirtatious relationship developed between Smith and Excilia Duque. However, these individuals never dated nor had any type of sexual relationship.
9. As the friendship developed among them, both Tammy Duque and the Defendant, Excilia Duque, began telling Smith and Huffman about the relationship that the family had with the deceased, Louis Angel Duque.
10. Louis Angel Duque was the ex-husband of Excilia Duque and the father of Tammy Ann Duque.
11. Both women, at various times, told Smith and Huffman of the deceased’s serious alcohol abuse problem. They also told of beatings that the deceased had inflicted upon all members of the family. Both women told Smith and Huffman about how the deceased had almost raped Tammy Duque on one occasion because he thought that she was Excilia. This last statement seemed to particularly upset Huffman.
12. There were statements made between Smith, Huffman, Tammy Duque and Excilia Duque regarding how the family would be better off if Louis Du-que were dead.
13. Both women stated that if Louis Duque were dead, the Duque family would be the beneficiary of a large insurance policy. With the proceeds, the house could be fixed up and things would be better for Tammy, Excilia, and the young sons.
14. Excilia Duque personally made these statements on repeated occasions to both Smith and Huffman.
15. On May 29, 1982, Louis Duque unkowingly [sic] signed a deed relinquishing to Excilia all of his right, title and interest in the residence and real property upon which Excilia, her sons and Tammy were living.
16.Tammy and Excilia Duque had devised a plan by which they would “trick” the deceased into unknowingly signing this quit-claim [sic] deed.

23. In mid August, 1982, Tammy and Excilia Duque returned to Stewart Title Company with an acknowledgment that they hoped would cure any defect in the preparation of the quit-claim [sic] deed. However, Excilia Duque was again informed that the acknowledgment was insufficient to properly record the deed. Excilia Duque left the documents there and insisited [sic] that they be filed.
24. On September 2, 1982, Louis Du-que had his attorney send Excilia a letter advising her that Mr. Duque was planning to move a trailer onto the rear of said property and that he would be living in the trailer.
25. Upon receiving this letter, Excilia borrowed a car from Smith, traveling to the title company. Once at the title company, Excilia angrily accused the title company of failing to properly do the work that they had promised to do, getting very angry with the employees there.
26. She phoned the title company early the following week of September 6, 1982, and told them she wanted the documents filed by Friday, September 10, 1982, (before the weekend) or somebody was going to burn.
27. Louis Duque was murdered September 9, 1982. The documents were recorded by the title company on September 10, 1982, the day on which his body was found.
28. In the latter part of August, 1982, Sandra G. Fields was the Duque’s next door neighbor. She lived there with George Duque, the brother of the deceased.
29. During that time, Sandra Fields visited Excilia Duque. There were other persons in the room during that visit, *761 notably Stanley Smith, Tammy Dnque and the youngest child.
30. The discussion turned to Mr. Du-que, concerning two matters.

33. The second item of discussion pertained to Mr. Duque’s attempt to move the trailer back onto the real estate.
34. According to Sandra Fields’ testimony, she advised Excilia that Louis Du-que could do that because Louis and Ex-cilia owned the property jointly.
35. Fields further testified that Exci-lia said that she would live to see him dead; that she may not do it, but she knew someone who would do it and it wouldn’t cost her a penny.
36. Thereafter, Tammy, Smith, and Huffman began planning Duque’s death.
37. In early September, on or about the Wednesday after Labor Day, Smith came to the Duque household and was met at the door. She[1] said, “I want the sucker dead by the weekend.” They briefly discussed the murder in the house and then left, going to Huffman’s house to pick him up.
38. While Tammy and Smith were discussing the matter at the Duque’s house, Excilia was sitting watching television. According to Smith’s testimony, the television was on rather loudly, and he and Tammy, while not whispering, were speaking softly.
39. Excilia did not participate in this discussion nor did she acknowledge that it was taking place, however, Smith assumed that her silence meant that she knew about the plan and was agreeable. In his sworn statement to the office of the State Attorney, Smith said, “I don’t know if she heard us or not,” talking about whether Excilia heard the discussion about how Tammy wanted her father dead by the weekend.
40. Upon leaving the Duque home, Smith and Tammy picked up Huffman, advising him that Tammy wanted her father dead before the week-end [sic].
41.Tammy, Smith and Huffman then devised a plan for luring Duque to the Interbay area of Tampa, near MacDill Air Force Base.

43. On the date he died, Lous [sic] Duque did indeed pick up Tammy in the Interbay area. Before they got to the place where Smith and Huffman lay in wait, Mr. Duque stopped the car to urinate. This was after dark on the evening of September 9, 1982.
44. Tammy then had him walk towards Smith and Huffman.
45. As Duque approached, there was a discussion between Smith and Huffman as to who would shoot Duque. Smith ended up with the gun.
46. Huffman walked out on the road from his hiding place, confronted Duque with a tire iron, causing Duque to move away from Tammy.
47. Smith then shot Duque with a shotgun. As the three of them stood over his prone body, Huffman encouraged Smith to shoot Duque again. Smith shot him twice more.
48. Smith, Huffman and Tammy then loaded the body into the rear of Duque’s car and covered it.
49. Tammy and Huffman drove Smith’s car. Smith drove the deceased in the deceased’s care [sic].
50. The car containing Mr. Duque’s body was found on or about September 10, 1982.
In addition to the statement of facts contained in appellee’s Exhibit “A,” the record reveals other alleged facts of importance to the motion to dismiss. There was discussion with Smith wherein appellee stated she could fix up their home with the proceeds of the $250,000 insurance policies on Mr. Duque’s life, and that if Mr. Duque were dead, they would not have to worry about *762 “nothing.” When Sfriith was asked why he killed Mr. Duque, he replied, “Because Tammy and her mother were constantly badgering me about how they'd like to see him dead....”
As this court stated in State v. Lewis, 463 So.2d 561 (Fla. 2d DCA 1985), “In a criminal case, a motion to dismiss should be granted only where the most favorable construction to the state would not establish a prima facie case of guilt. State v. Davis, 243 So.2d 587 (Fla.1981).”
A defendant to prevail on a 3.190(c)(4) motion to dismiss must allege that the material facts are undisputed, set those facts out and demonstrate that they fail to establish a prima facie case of guilt. If the undisputed facts as alleged by a defendant do not meet that burden, then a response from the state is unnecessary and the motion must be denied. State v. Pastorius, 419 So.2d 1137 (Fla. 4th DCA 1982). On a 3.190(c)(4) motion, the trial court may not weigh the evidence, but all inferences must be resolved against the defendant. State v. Upton, 392 So.2d 1013 (Fla. 5th DCA 1981).
This is a case largely dependent on circumstantial evidence. The trier of fact must resolve the ultimate question of whether the facts and circumstances are consistent with guilt and inconsistent with any reasonable hypothesis of innocence. Heiney v. State, 447 So.2d 210 (Fla.1984).
Section 777.04(2) defines the crime of solicitation as soliciting “another to commit an offense prohibited by law and in the course of such solicitation commands, encourages, hires, or requests another person to engage in specific conduct which would constitute such offense or an attempt to commit such offense.... ” In State v. Gaines, 431 So.2d 736 (Fla. 4th DCA 1983), Judge Glickstein, quoting from W.R. La-Fave and A.W. Scott, Jr., in Handbook on Cñminal Law, concludes that the crime of solicitation is complete when the solicitor has enticed, advised, incited, ordered or otherwise encouraged others to commit the crime charged.
The trial judge focused on the words “commands, encourages, hires, or requests” contained in section 777.04(2) to conclude that they require some “overt” or “affirmative action” on the part of the accused. We find that there is no limitation in the case law or in section 777.04(2) as to the type of conduct which may constitute enticing, advising, inciting, or encouraging, as set forth in State v. Gaines, so as to equate to the statutory language of “commands, encourages, hires, or requests.” We agree with the trial judge that the key statutory word in this case is “encourage.” We disagree with his conclusion that a definition of that word requires an “overt” or “affirmative act” in the context that he applied those terms. A resort to Black’s Law Dictionary (5th ed. 1979) will reveal that the acts of the appellee, as set forth in her motion to dismiss and its Exhibit “A,” could be determined by a jury to embrace any or all of the terms “encourage,” “entice,” “advise” or “incite.”
We, therefore, reverse and remand for treatment consistent herewith.
OTT, A.C.J., and HALL, J., concur.

. The statement of facts does not make clear who "she” is but, from the record, we discern that in regard to this statement it was Tammy Duque. However, at about the same time, ap-pellee is quoted by Smith as having said, "I [sic] just like to see that sucker dead and out of my life.”