EMAS, J.,
concurring in part and dissenting in part.
I concur in Parts I through IV of the majority opinion. However, I do not agree with the analysis, or the result reached, in Part VI[26] and, therefore, dissent from that portion of the majority opinion. Because my analysis of the issue in Part VI is dispositive of this appeal,[27]1 conclude that we must reverse with directions to vacate the judgment and sentence and enter a judgment of acquittal.

A. Introduction

The majority opinion frames the issue in Part VI as follows:

Reclassification of the second degree murder was lawful because the State presented evidence and the jury found that the defendant personally carried a firearm during his role as a “principal in the first degree” to second degree murder

However, in determining whether the second-degree murder offense in this case may lawfully be reclassified, the dispositive question is:

Did Connolly carry a firearm “during the commission of” the murder?

This question requires us to determine whether, under the language of the reclassification statute and in light of the evidence in this case, Connolly’s second-degree murder as principal can properly be reclassified for carrying a firearm, where:
1. Connolly carried a firearm in Boston when he met with, and aided and abetted, others who actually committed the murder;
2. The murder was committed three weeks later in Miami; and
3. Connolly was neither actually nor constructively present when others committed the murder.

B. The Relevant Statutes

To answer the dispositive question, we must construe the relevant language of the reclassification statute, section 775.087(1), Florida Statutes (1981), and its interplay with the principal statute, section 777.011, Florida Statutes (1981).
The reclassification statute (section 775.087(1)) provides in pertinent part:

775.087. Possession or use of weapon; aggravated battery; felony reclassification; minimum sentence

(1) Unless otherwise provided by law, whenever a person is charged with a felony, except a felony in which the use of a weapon or firearm is an essential element, and during the commission of such felony the defendant carries, displays, uses, threatens to use, or at *941 tempts to use any weapon or firearm, or during the commission of such felony the defendant commits an aggravated battery, the felony for which the person is charged shall be reclassified as follows: (a) In the case of a felony of the first degree, to a life felony.
(Emphasis added.)
The principal statute (section 777.011) provides:
777.011. Principal in first degree[28]
Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense. (Emphasis added.)
C. The Question Presented: Did Connolly carry a firearm “during the commission of” the murder?
The question for our determination: Does Connolly’s carrying of a firearm at a meeting with co-defendants in Boston, during which he aided and abetted the murder committed by others three weeks later in Miami (while Connolly was in Boston), satisfy the statutory language authorizing reclassification of an offense when a defendant carries a firearm “during the commission of’ the felony?
Under the majority’s analysis, reclassification is authorized under the statute because:
• Connolly met with Bulger and Flemmi in Boston three weeks before the murder, which was committed in Miami;
• During the meeting, Connolly discussed, and helped to plan, the murder actually committed by. Bulger and Flem-mi (and Martorano) three weeks later in Miami;
• During this meeting with Bulger and Flemmi, Connolly carried a firearm; and
• Connolly’s act of aiding and abetting constituted a part of the acts or series of acts of the second-degree murder, making Connolly guilty as an active co-perpetrator of, and not simply a principal to, the murder.
*942 Therefore, the majority concludes, Connolly carried a firearm “during the commission” of the second-degree murder. I do not agree that the act of Connolly— episodically remote in both place and time from the commission of the murder by others — took place “during the commission of’ the murder, nor do I agree that the act of Connolly constitutes part of the “series of acts” as defined by the second-degree murder statute, such that Connolly can be deemed an active co-perpetrator of, as opposed to a principal to, the murder.

1. Under the plain language of the reclassification statute, the carrying of the firearm did not occur “during the commission of’ the felony.

Because this is an issue of statutory construction, I begin by reviewing the statutory language; if the language is plain and unambiguous, it is unnecessary to resort to rules of statutory construction. Daniels v. Fla. Dep’t of Health, 898 So.2d 61, 64 (Fla.2005). Further, even if I were to conclude that the relevant language is ambiguous and reasonably subject to differing constructions,[29] the rule of lenity requires that we construe it in favor of the defendant. § 775.021(1), Fla. Stat. (1981); Houck v. State, 634 So.2d 180, 182 (Fla. 5th DCA 1994); Willingham v. State, 541 So.2d 1240, 1242 (Fla. 2d DCA 1989).
I conclude that there is no ambiguity in the language of the reclassification statute and that, giving the words of the statute their plain and ordinary meaning, the offense in this case is not subject to reclassification. The statute does not define the phrase “during the commission of’ the felony, nor is this phrase defined elsewhere in Florida’s statutes.[30] However, a similar phrase — “in the course of committing” a felony — is used and defined in several other statutory provisions.[31]
For example, statutes proscribing the crimes of robbery, robbery by sudden snatching and carjacking each provide that the offense shall be classified as a higher-degree offense if “in the course of committing” the crime the offender carries a firearm or deadly weapon. See §§ 812.13(2)(a), 812.131(2)(a), 812.133(2)(a), Fla. Stat. (2015). Each of these statutes define the phrase “in the course of committing” uniformly:
An act shall be deemed “in the course of committing the robbery” if it occurs in *943 an attempt to commit robbery or in flight after the attempt or commission.
§ 812.13(8)(a), Fla. Stat. (2015).
An act shall be deemed “in the course of committing a robbery by sudden snatching” if the act occurs in an attempt to commit robbery by sudden snatching or in fleeing after the attempt or commission.
§ 812.131 (3)(a), Fla. Stat. (2015).
An act shall be deemed “in the course of committing the carjacking” if it occurs in an attempt to commit carjacking or in flight after the attempt or commission.
§ 812.133(3)(a), Fla. Stat. (2015).
As a final example, Chapter 810, Florida Statutes, proscribes the crime of burglary, and classifies a burglary as a higher-degree offense if “in the course of committing the offense” the offender is or becomes armed, or commits an assault or battery. See § 810.02(2)(a)-(b), Fla. Stat. (2015). The statutory definition of “in the course of committing” is identical to the corresponding provisions of the robbery and carjacking statutes:
An act is committed “in the course of committing” if it occurs in an attempt to commit the offense or in flight after the attempt or commission.
§ 810.011(4), Fla. Stat. (2015).
It is difficult to conceive how the phrase “during the commission of’ a crime can be construed more broadly than the phrase “in the course of committing” a crime.[32] In fact, one might cogently argue that the undefined phrase “during the commission of’ should be read more narrowly than the defined phrase “in the course of committing.” However, even if we equate the two phrases and construe the phrase “during the commission of’ the murder to mean “an act which occurs in an attempt to commit [murder] or in fleeing after the attempt or commission [of the murder,]” it is evident that Connolly’s carrying of the firearm did not occur “during the commission of’ the murder, and his conviction for second-degree murder cannot be reclassified.
It is important to note that the reclassification statute is not limited to situations in which a defendant carries a firearm during the commission of felony; there are several different acts which, if undertaken during the commission of the felony, will subject a defendant’s offense to reclassification. Specifically, the statute authorizes reclassification of an offense for a defendant who:
1. “During the commission of’ the felony:
a. Carries any weapon or firearm;
b. Displays any weapon or firearm;
c. Uses any weapon or firearm;
d. Threatens to use any weapon or firearm; or
e. Attempts to use any weapon or firearm.
2. “During the commission of’ the felony “commits an aggravated battery.”
See § 775.087(1), Fla. Stat. (1981).
Each of these acts forms an independent basis for reclassification and all are contained within the very same clause of the very same subsection of the reclassification statute. These words and phrases must be read together and construed in a man *944 ner to make them compatible and not contradictory, giving meaning to the entire statute and each word within it. Fla. Dep’t of Envtl. Protection v. ContractPoint Fla. Parks, LLC, 986 So.2d 1260, 1265 (Fla.2008). There is nothing in the reclassification statute to indicate that the phrase “during the commission of’ a crime includes a principal whose carrying of a firearm is temporally and spatially remote from the actual commission of the crime. The Florida Legislature could have expressly authorized reclassification of an offense for a defendant who carries (or displays, uses, threatens to use, or attempts to use) a firearm “during the commission of or while aiding and abetting the commission of” an offense. In fact, the Legislature did precisely that in enacting certain forfeiture legislation. See e.g., § 932.701(2)(a), Fla. Stat. (2015)[33]; § 831.033, Fla. Stat. (2015).[34] Given the language employed in these statutes, it is evident that the Legislature recognizes the distinction between a firearm that is used “during the commission of’ a felony and a firearm that is used “during the aiding and abetting in the commission of’ a felony.

2. How could Connolly have carried a firearm “during the commission of’ the murder if Connolly did not commit the murder and was not actually or constructively present when the murder was committed by others?

Given the plain language of the principal statute, it is clear that Connolly can be held equally culpable with his co-principals for the second-degree murder, because he intended that the murder be committed and he did some act to aid and abet other persons who actually committed the crime. The principal statute provides:
Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be *945 charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.
§ 777.011, Fla. Stat. (1981). These requirements are echoed in the case law and in the standard jury instructions. See Potts v. State, 430 So.2d 900 (Fla.1982); State v. Roby, 246 So.2d 566 (Fla.1971); Barron v. State, 990 So.2d 1098 (Fla. 3d DCA 2007); Fla. Std. J. Inst. (Crim.) 3.5(a).[35]
Connolly’s act of aiding and abetting makes him equally criminally responsible for the second-degree murder, and the principal statute expressly provides that Connolly need not have been actually or constructively present to be deemed equally culpable for the murder. But his culpability for the murder under the principal statute is far different from the question of whether his carrying of the firearm “during the commission of the felony” requires his actual or constructive presence. We must therefore separate the issue of presence for culpability as a principal from the issue of presence for reclassification purposes. Under the principal statute (§ 777.011), a person may be found guilty if he either:
“commits any criminal offense;” or
“aids, abets, counsels, hires, or otherwise procures such offense to be committed.”
It is beyond peradventure that the State prosecuted this case not upon a theory that Connolly committed the murder himself, but rather that Connolly was equally criminally responsible as if he committed the murder because he aided, abetted, counseled, hired or otherwise procured such offense “to be committed” by others.[36] The clear language of the principal statute establishes that, under this theory, a principal is not one who himself “commits any criminal offense” but rather is one who “aids, abets, counsels, hires, or otherwise procures such offense to be committed” by another.
The trial court correctly instructed the jury that, in order to find Connolly guilty of murder under the principal theory, the State had to prove that he “had a conscious act that the criminal act be done” and he “did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually com *946 mit ... the crime.” Fla. Std. J. Inst. (Crim.) 3.5(a) (emphasis added). Thus, Connolly’s criminal responsibility for the murder was necessarily premised upon the fact that the crime was actually committed by someone other than Connolly.
It is in this context that we examine the reclassification statute. Before the crime of second-degree murder can be reclassified to a life felony, it must be established that Connolly carried a firearm “during the commission of’ the murder. But how can one logically conclude that Connolly carried a firearm during the commission of the murder where: the murder was “actually committed” by others; Connolly was not present (actually or constructively) when the murder was actually committed by others; and Connolly’s carrying of the firearm occurred three weeks before the actual commission of the murder by others?
The fact that Connolly was not actually or constructively present is concededly irrelevant to his conviction as a principal to second-degree murder. However, I conclude Connolly’s second-degree murder conviction as a principal cannot be reclassified under section 775.087(1) because he did not carry use, display, threaten to use, or attempt to use any weapon or firearm while actually or constructively present during the commission of the offense.[37] Stated another way, I cannot agree that Connolly carried a firearm “during the commission of’ the murder and therefore conclude that his conviction as principal to second-degree murder is not subject to reclassification.

3. ■ The majority’s construction of the reclassification statute would lead to absurd results.

Any reasonable and' contextual reading of the statutory language leads inexorably to the conclusion that the acts committed by Connolly in this case do not fall within the ambit of the reclassification statute. However, even if one could conclude that the statutory language is ambiguous and subject to differing constructions, rules of statutory construction require that we construe the language in such a way as to avoid an absurd result. Thompson v. State, 695 So.2d 691 (Fla.1997). The majority’s expansive construction of the phrase “during the commission of’ would indeed lead to unreasonable and absurd results when applied to other circumstances.[38]
If, as the majority concludes, Connolly’s actions as principal in the instant case fall within the ambit of the reclassification statute, so too would the actions of the hypothetical Principal in the following scenarios. Note that in each of these scenar *947 ios (as in the instant case) the co-principal commits the murder three weeks later, and the Principal is not actually or constructively present at the murder:

•“Carries” or “uses” a weapon “during the commission of’ the murder

Principal and co-principal meet at a restaurant. Principal orders steak, and when the waiter brings the steak, Principal pulls a ten-inch hunting knife out of his pocket and uses it to cut his steak while encouraging co-principal to commit the murder. Under the statutory language as construed by the majority, Principal’s conviction for second-degree murder may be reclassified because “during the commission of’ the felony, Principal “carries” or “uses” a weapon (i.e., the hunting knife to cut his steak).

•“Threatens to use” a weapon “during the commission of’ the murder

During that same dinner, and while' Principal is encouraging co-principal to commit the murder, Principal gets angry at one of the waiters, raises his hunting knife and yells at the waiter “I will cut you with this knife if you don’t bring us some more bread.” Under the statutory language as construed by the majority, Principal’s conviction for the second-degree murder may be reclassified because “during the commission of’ the felony, Principal “threatens to use” a weapon (though the threat is made three weeks before the murder is committed, and is directed not at the intended victim of or a bystander to the murder, but rather at the waiter).

•“Threatens to use” a firearm “during the commission of’ the murder

During that same dinner, and while Principal is encouraging co-principal to commit the murder, Principal says: “I’ve never owned a gun, but if you don’t go and kill him, I’m going to go buy a gun and kill him myself.” Under the statutory language as construed by the majority, Principal’s conviction for second-degree murder may be reclassified because “during the commission of’ the second-degree murder, Principal “threatens to use” a firearm (though the threat’ is made three weeks before the murder is committed, and is directed not at the intended victim or a bystander of the murder, but at the co-principal).

•“Commits an aggravated batterg” “during the commission of” the murder

During that same dinner, and while Principal is encouraging co-principal to commit the murder, Principal gets in a fight with the waiter and kicks the waiter in the head, causing permanent injuT ry. Under the statutory language as construed by the majority, Principal’s conviction for second-degree murder may be reclassified because “during the commission of’ the second-degree murder, Principal “commits an aggravated battery.”

•“Uses” a firearm “during the commission of’ the murder

Principal and co-principal hold their meeting at a gun range. Principal is taking target practice (using a gun provided by the range) while encouraging co-principal to commit the murder. Under the statutory language as construed by the majority, Principal’s conviction for ■ second-degree murder may be reclassified because “during the commission of’ the second-degree murder, Principal “uses” a firearm. (Of note, under the majority’s analysis, Principal would also be subject to a 20-year mandatory minimum under section 775.087(2)(a)2. (the “10/20/Life” statute) because “during the course of the commission of’ the murder, Principal “discharged a firearm.”)

•“Displays” a firearm “during the commission of” the murder

*948 Principal and co-principal hold their meeting at Principal’s house. While encouraging co-principal to commit the murder, Principal shows off a Winchester rifle displayed above his fireplace. Co-principal admires it and Principal takes it out of the display case and lets co-principal hold it in his hands. Under the statute as construed by the majority, Principal’s conviction for second-degree murder may be reclassified because “during the commission of’ the second-degree murder, Principal “displays” a firearm.[39]
These scenarios expose the infirmity in the majority’s construction of the reclassification statute. I conclude that there must be some episodic connection — a temporal and spatial relationship — between the act (carry, display, use, threaten to use, or attempt to use a firearm or weapon) and the commission of the underlying offense. Construing the phrase “during the commission of’ the murder as the majority proposes would lead to absurd results such as those described above. A plain and common-sense reading of the reclassification compels the conclusion that Connolly did not carry a firearm “during the commission of’ the murder.

4. The majority’s analysis requires a conclusion that the commission of the second-degree murder “began” during the meeting in Boston.

While not directly addressing the issue, the majority’s analysis implicitly requires us to answer this question as well: When did the commission of the second-degree murder begin ? According to the majority, the commission of the second-degree murder necessarily “began” in Boston during the meeting between Connolly and his cohorts. This must be the majority’s conclusion, for it is the only way they can shoehorn their conclusion that Connolly’s carrying of the firearm occurred “during the commission” of the murder. In other words, the majority asserts that Connolly’s acts at that meeting constituted part of the actual commission of the second-degree murder (rather than acts of aiding and abetting making him equally responsible as a principal to the murder subsequently committed by others). The majority’s assertion is flawed, however. While the planning and preparation for the murder certainly began at this meeting, the commission of the murder did not “begin” during this meeting. Connolly’s acts at that meeting are not the commission of the second-degree murder, and therefore his carrying of the firearm during this meeting did not occur “during the commission of’ the murder.
Perhaps the most effective way to analyze this aspect of the majority’s position is by considering the following: If in fact this meeting marks the “beginning” of the commission of the murder, and had the murder not been consummated, then it must follow that Connolly could have been convicted of attempted second-degree murder based simply on his acts which took place at that meeting with his co-defendants. In other words if, as the majority asserts, Connolly’s acts at that meeting (followed by the subsequent commission of the murder) means he is guilty as one who himself “committed the murder,” then his acts at that meeting (followed by a failure to consummate the murder) would have supported his conviction for attempted second-degree murder.
By looking at it in this fashion, and analyzing relevant case law regarding criminal attempts, one can readily con- *949 elude that the majority’s analysis is bereft of support. While Connolly’s acts and meeting with his co-principals might well have supported a conviction for solicitation or conspiracy (see discussion infra), his acts and meeting with his co-principals surely could not support a conviction for attempted second-degree murder, because his acts consisted of mere planning and preparation.
An attempt to commit a crime requires proof of two elements: a specific intent to commit the crime, and an overt act, beyond mere preparation, done towards its commission, but falling short of consummation of the crime. Gustine v. State, 86 Fla. 24, 97 So. 207, 208 (1923); State v. Coker, 452 So.2d 1135 (Fla. 2d DCA 1984). There is little doubt that Connolly had the specific intent to commit the crime of murder. However, there is no evidence that he “did some act toward committing the crime of [murder] that went beyond just thinking or talking about it.” Fla. Std. J. Inst. (Crim.) 5.1. Therefore, Connolly’s intent that the murder take place, while clearly established, is insufficient to allow one to conclude that the commission of the crime had begun. There must be proof of an overt act beyond mere preparation:
The intent to commit a crime standing alone does not amount to an attempt nor is preparation alone sufficient. The overt act must reach far enough towards the accomplishment of the desired result to amount to a commencement of the consummation. There must be some appreciable fragment of the crime committed and it must be in such progress that it would be consummated unless interrupted by circumstances independent of the will of the attempter.
Robinson v. State, 263 So.2d 595, 596-97 (Fla. 3d DCA 1972).
The meeting, held three weeks before the murder, consisted of planning and preparation, acts which are insufficient to establish the commencement of the crime:
Preparation generally consists of devising or arranging the means or measures necessary for the commission of the offense. The attempt is the direct movement toward the commission after preparations are completed. 21 AM.JUR.2d Criminal Law § 159 (1981). The act must reach far enough toward accomplishing the desired result to amount to commencement of the consummation of the crime. Some appreciable fragment of the crime must be committed and it must proceed to the point that the crime would be consummated unless interrupted by a circumstance independent of the attemptor’s will. Robinson v. State, 263 So.2d 595 (Fla. 3d DCA 1972); Groneau v. State, 201 So.2d 599 (Fla. 4th DCA), cert. denied, 207 So.2d 452 (Fla.1967). The act need not be, however, the ultimate, the last proximate, or the last possible act toward consummation of the crime. State v. Thomas, 438 S.W.2d 441 (Mo.1969).
Coker, 452 So.2d at 1136-37.[40]
In Arias v. State, 593 So.2d 260 (Fla. 3d DCA 1992), the defendant, a director of nursing, was charged with attempted first-degree murder. The State’s evidence established that an infant was born with *950 severe birth defects and placed under the supervision of Arias and other nurses, who regularly administered pain-killing medication to ease the child’s suffering. Arias contacted and met with Judy Felsenstein, a nurse under Arias’ supervision. The two discussed a plot to kill the child by administering an overdose of pain medication. Arias later brought Etiole Means into the scheme. Means and Arias knew each other and had previously worked together. The three of them met and together, discussed the details of their plan to kill the child. Arias told Felsenstein and Means that the child’s grandfather was aware of the plan and had approved it. Means was required to apply for a temporary nursing position with Arias’ company. After Means was hired for the position, Arias gave Means a bottle of medication which was to be administered to the child in a lethal dose. Ultimately, Means did not carry out the plot, and instead went to the police and confessed.
Arias was charged with and convicted of, inter alia, attempted first-degree murder. On appeal, Arias argued that the evidence was legally insufficient to support the attempted murder conviction. This Court agreed:
In this case, the state presented evidence which showed that Arias met with Means and Felsenstein, discussed the murder plot, and then gave Means the bottle of Hycomine. The plot to kill the child went no further. The discussions occurred four days before the murder was to take place. Means testified that she had not decided to help Arias kill the child and Means nevér took any active steps toward completion of the crime. The evidence shows that the acts committed by Arias were only those of preparation to commit the crime and did not rise to the level of overt acts nearing consummation of the crime. Therefore, the evidence was not sufficient to sustain a verdict of attempted first degree murder. See Robinson; see also Gervin v. State, 212 Tenn. 653, 371 S.W.2d 449 (1963) (defendant’s hiring and attempt to persuade person to commit murder amounted to mere preparation only and was not an attempt to commit first degree murder). The murder conviction is therefore reversed.
Id. at 263.
In the instant case, the “acts” engaged in by Connolly, at a meeting with his co-defendants three weeks before the murder, were not acts which “reach far enough toward accomplishing the desired result to amount to commencement of the consummation of the crime.” Coker, 452 So.2d at 1136. The acts engaged in by Connolly fall far short of those found insufficient in Arias. Connolly’s acts were simply preparatory, consisting of “devising or arranging the means or measures necessary for the commission of the offense.” Coker, 452 So.2d at 1136. See also Morehead v. State, 556 So.2d 523, 525 (Fla. 5th DCA 1990) (defendant prisoner was convicted of attempted escape, upon State’s evidence that defendant committed overt acts in furtherance of the crime by 1) intentionally cutting himself to obtain medical treatment at an off-site facility where he hoped his girlfriend would meet him and help him make good his escape; and 2) causing a confederate to introduce a gun onto the prison grounds for defendant’s use to assist in his escape. Conviction reversed, holding “neither act amounted to an overt act beyond mere preparation.”).
While the acts of Connolly were certainly sufficient to make him a principal to the murder subsequently committed by others, and thus equally responsible as if he had committed the murder himself, Connolly’s' acts most assuredly did not constitute the beginning of the commission of the second-degree murder, such that his carrying of a firearm could be said to have occurred *951 “during the commission of’ the murder. The majority’s conclusion to the contrary flies in the face of well-settled case law and implicitly recedes from this Court’s decisions in Arias and Robinson.

5. Distinguishing aiding and abetting from solicitation, conspiracy and possessory offenses.

The majority analogizes this case, and the offense, to cases that either expressly or implicitly authorize reclassification for possession of a firearm during the commission of a criminal conspiracy or a possesso-ry offense. Such an analogy is inapplicable for reasons that are further explained below.[41] But the one distinguishing feature that separates the offense at hand from all of the other “analogous” offenses relied upon by the .majority is this: Connolly’s act of aiding and abetting (i.e., the act during which he carried a firearm) was not charged as a separate and completed crime. Connolly’s criminal culpability as a principal did not materialize until the murder was committed or attempted. See § 775.011, Fla. Stat. (“Whoever ... aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree.”). There is no longer a crime of “aiding and abetting,” in the absence of an attempted or committed criminal offense. It is with this backdrop in mind that we review the application of the reclassification statute to other types or categories of offenses.

a. Distinguished from solicitation

Connolly’s act in this case consisted of aiding and abetting the actual perpetrators of the murder. While this act could have subjected Connolly to prosecution for criminal solicitation, the State did not charge Connolly with such a crime. The crime of criminal solicitation requires proof that:
1. Defendant solicited another to commit an offense; and
2. During the solicitation, defendant commanded, encouraged, hired or-requested another person to engage in specific conduct which would constitute the commission of the offense solicited or an attempt to commit the offense solicited.
See § 777.04(2), Fla. Stat. (1981). See also Fla. Std. J. Inst. (Crim.) 5.2. The solicited crime need not actually be committed, nor is it necessary that the defendant or the person solicited commit any act in furtherance of the offense solicited. Id. See also State v. Waskin, 481 So.2d 492 (Fla. 3d DCA 1985); State v. Duque, 472 So.2d 758 (Fla. 2d DCA 1985).[42] The crime of solicitation is complete when, the defendant, with the intent that another person commit a crime, commands, encourages, hires or requests that person to commit a crime. Waskin, 481 So.2d at 493. Had the State charged Connolly with criminal solicitation, and had the jury found him guilty of said crime, Connolly’s carrying of a firearm during the completed criminal offense of solicitation, would presumably have authorized reclassification under section 775.087(1), because Connolly himself committed the acts constituting the criminal offense of solicitation and committed those acts while carrying a firearm. The crime of solicitation would have been complete upon his act of soliciting another to commit *952 the crime, coupled with his intent that the crime be committed. However, Connolly was neither charged with nor convicted of armed solicitation.
This distinction between armed solicitation and “armed aiding and abetting” (a non-crime) reveals the shortcomings in the majority’s position. Under the armed solicitation, Connolly’s guilt is not premised upon a principal theory. The offense of solicitation would have actually been committed by Connolly himself and the crime would have been complete at the moment he solicited another to commit the crime with the intent that such crime be committed. If Connolly was carrying a firearm during this act (an act committed by Connolly himself and constituting a completed crime), reclassification would be authorized.
By comparison, in the instant case no crime was committed or completed upon Connolljf s act of aiding and abetting (while carrying a firearm) three weeks before the murder. Connolly’s criminal culpability as a principal to murder did not even come into existence until the murder was actually committed by others three weeks later. Unlike criminal solicitation, Connolly’s act in this case did not constitute a completed crime committed by Connolly himself. Therefore, Connolly’s act of carrying a firearm while aiding and abetting three weeks before the actual commission of the murder by others cannot be said to have occurred “during the commission of’ the murder.

b. Distinguished from conspiracy

Connolly was charged with (but acquitted of) conspiracy to commit murder. His criminal culpability under the conspiracy charge is premised upon his direct participation in committing the crime of conspiracy to commit murder. Conspiracy requires the following two elements be proven:
1. The defendant intended that the offense (which was the object of the conspiracy) be committed.
2. In order to carry out that intent, the defendant agreed, conspired, combined, or confederated with others to cause the object of conspiracy to be committed either by them, or one of them, or by some other person.
See § 777.04(3), Fla. Stat. (1981); Fla. Std. J. Inst. (Crim.) 5.3. It is not necessary that the defendant do any act in furtherance of the offense conspired. Fla. Std. J. Inst. (Crim.) 5.3. See also State v. Burkett, 344 So.2d 868 (Fla. 2d DCA 1977). The conspiracy is formed and a crime is • “committed” and complete upon the occurrence of these two elements — the agreement coupled with the requisite intent. The completed crime of conspiracy is based upon the direct and active participation of the individual conspirators, and is implicitly not based on a principal theory.
Furthermore, even though a conspiracy crime may be complete upon the occurrence of the two elements described above, a conspiracy is also in the nature of a continuing offense, and “once the conspiracy is formed, a defendant who has joined a conspiracy continues to violate the law ‘through every moment of [the conspiracy’s] existence.’ ” Smith v. United States, - U.S. -, 133 S.Ct. 714, 719, 184 L.Ed.2d 570 (2013) (quoting Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)). Had the jury convicted Connolly of conspiracy to commit murder, the fact that Connolly carried a firearm at any point during his membership in the conspiracy would appear to subject the offense to reclassification, because Connolly himself committed those acts which constitute the completed (and continuing) crime of conspiracy, and did so while carrying a firearm. See, e.g., Camp *953 bell v. State, 935 So.2d 614 (Fla. 3d DCA 2006); Kennedy v. State, 564 So.2d 1127, 1129 (Fla. 1st DCA 1990) (noting in dicta that co-conspirators who are armed while agreeing, conspiring, combining or confederating to cause the object of the conspiracy would be subject to reclassification).

c. Distinguished ft'om possessory offenses

Narcotics possession, and other “posses-sory” crimes, are in the nature of a continuing offense. For example, so long as a defendant is and remains in possession of cocaine, he is committing a crime. If at any point he is simultaneously in possession of cocaine and a firearm, the possesso-ry offense (assuming it falls within the category of applicable offenses under the statute) may properly be reclassified. See, e.g., Menendez v. State, 521 So.2d 210 (Fla. 1st DCA 1988); Smith v. State, 438 So.2d 10 (Fla. 2d DCA 1983).
Offenses which are continuing in nature are to be distinguished from discrete offenses which are complete upon the commission of the elements of the crime. Illustrative of this distinction is Willingham v. State, 541 So.2d 1240 (Fla. 2d DCA 1989). In that case, Willingham was charged with possession with intent to deliver cocaine and sale of cocaine. It was alleged that Willingham carried or used a firearm during the commission of these offenses. The evidence at trial established that Willingham and an accomplice sold cocaine to an undercover officer. The accomplice was in possession of a firearm during the transaction. After the sale was complete and the undercover officer began driving away, Willingham took the firearm from the accomplice and began shooting at the departing officer. Willingham was convicted of sale of cocaine with a firearm,[43] and the trial court reclassified Will-ingham’s offense from a second-degree felony to a first-degree felony pursuant to section 775.087(1) on the basis that the defendant used a firearm “during the commission of’ the offense of sale of cocaine. The Second District reversed, holding:
In this instance, the sale of cocaine offense involved an exchange of the cocaine for money. This exchange, and therefore the offense, was completed before Willingham seized the gun and began shooting it. As such, it cannot be said that Willingham “carried or used” the gun during the commission of the sale offense.
Id. at 1242. The instant case presents the flip side of the same coin in Willingham. In that case, the defendant’s conviction' could not be reclassified because the firearm was possessed after, rather than during, the commission of the offense. Here, the defendant’s conviction cannot be reclassified because the firearm was possessed before, rather than during, the commission of the offense.

6. Connolly was not a co-perpetrator of the actual murder, because his “act” as an aider and abettor was not imminently dangerous to another as required under the murder statute

In its final effort to support reclassification, the majority concludes that Connolly acted not merely as a principal but as an active co-perpetrator and that Connolly (as well as the co-defendants) personally “committed” the offense by aiding and abetting the eventual murder. This conclusion is unsupported by law and is not the theory or evidence upon which the State based its prosecution. Connolly was charged, prosecuted and convicted upon a theory (and upon evidence) that he did not *954 actually commit the murder but aided and abetted others who did commit the murder and was therefore guilty, as a principal. Under this theory and evidence, Connolly was equally criminally responsible as if he committed the murder, because he acted to aid or abet those who actually committed the murder. A review of the State’s opening statements and closing arguments, the transcripts of hearings on pre-trial and post-trial motions, and the State’s briefs on appeal, reveals one common theme: the State’s unwavering position that Connolly was not the person who committed the murder, but that he was equally culpable for the murder as a principal. The State has never advanced the “active co-perpetrator” theory embraced by the majority opinion.
Nevertheless, the majority opinion now characterizes Connolly’s acts of aiding and abetting as part of a series of related acts that supports his conviction not merely as a principal responsible for the acts of others who committed the murder, but as an active co-perpetrator of the murder itself.[44] The majority’s analysis, however, is flawed.
Certainly under the principal theory, the acts of others constitute the acts of Connolly and under that theory Connolly is equally criminally responsible for the acts of his co-defendants as if he had himself committed the murder. But it is just as clear that the “acts” constituting the crime of second-degree murder, as defined by the statute, the jury instructions, and the case law, were acts committed not by Connolly but by others. Connolly’s own acts were not the acts of the murder such that he can be reclassified as an active co-perpetrator of the murder.
Second-degree murder is defined in section 782.04(2), Florida Statutes (1981) as follows:
The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree and constitutes a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in s. 775.082, s. 775.083, or s. 775.084.
As the trial court correctly instructed the jury in this case, the offense of second-degree murder required the State to es *955 tablish, inter alia, that “there was an unlawful killing of John Callahan by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life.” See Fla. Std. J. Inst. (Crim.) 7.4 (emphasis added). Importantly, that same jury instruction provides a definition of the underscored phrase:
An act is “imminently dangerous to another and demonstrating a depraved mind” if it is an act or series of acts that ... a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another....
Fla. Std. J. Inst. (Crim.) 7.4. (Emphasis added.) See also State v. Montgomery, 39 So.3d 252, 255 (Fla.2010) (recognizing that the phrase “imminently dangerous to another and evincing a depraved mind” is an act or series of acts which “a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another”) (citations omitted). Coicou v. State, 39 So.3d 237, 243 n. 4 (Fla.2010); Pressley v. State, 395 So.2d 1175, 1177 (Fla. 3d DCA 1981).
The majority incorrectly concludes that Connolly’s act of aiding and abetting satisfied this definition, determining that Connolly, by his actions, was “signing a death warrant for” Callahan. See majority opinion at 915. However memorable or accurate this description may be, it falls short of what the law requires. Second-degree murder does not require merely that the act led to Callahan’s death, or was likely to result in Callahan’s death. Rather, second-degree murder requires that the act itself (or the series of acts) must be “reasonably certain to kill....” Montgomery, 39 So.3d at 255 (emphasis added). The distinction between these concepts is not merely semantic. It represents the difference between the act of Connolly (remotely aiding, abetting, and assisting his co-defendants in a manner that was reasonably certain to lead to Callahan’s death) and the act of Martorano (shooting Callahan in the back of the head with a firearm) that was reasonably certain to kill.
In Pressley, for example, this court held that “a person of ordinary judgment would know that firing a loaded gun toward a group of people is reasonably certain to kill or do serious bodily injury to another.” Pressley, 395 So.2d at 1177 (emphasis add-, ed). By contrast,' the act of Connolly in aiding and abetting by meeting with and encouraging his co-defendants cannot satisfy this definition of an “act” which is “imminently dangerous to another” because his act self-evidently was not “reasonably certain to kill ” even if one could conclude that his act was reasonably certain to lead to, or result in, death. The statute requires an actual, active act that is “reasonably certain to kill” (or do serious bodily harm). Montgomery, 39 So.3d at 255; Coicou, 39 So.3d at 243 n. 4; Pressley, 395 So.2d at 1177. Common' sense compels the conclusion that the act of Connolly in this case does not and cannot meet this definition. Despite the majority’s valiant effort, Connolly’s act in this case did not and cannot transform the State’s theory from an aider and abettor/principal theory to an “active co-perpetrator of the murder” theory.
Relatedly, the majority seeks to characterize the second-degree murder as a “continuing” or “on-going offense” in an attempt to bridge the temporal and spatial divide and thereby satisfy the “during the commission of’ language of the statute. See majority opinion at 919. This effort misses the mark, and would serve to transform the discrete offense of second-degree murder into a conspiracy offense or some other type of continuing offense. In support of this “continuing offense” theory, the majority relies upon Junco v. State, 510 So.2d 909 (Fla. 3d DCA 1987). How *956 ever, this case does not support the majority’s position. In Junco, the defendant (who was armed) and several co-defendants, (who were also armed) committed a robbery at a warehouse where marijuana was being stored. Two warehouse “guards” were killed in the course of the robbery, and another individual was injured. Junco left the scene prior to the shootings. Junco was convicted of two counts of second-degree murder with a firearm, attempted second-degree murder, robbery with a firearm, and trafficking in marijuana. The two murder convictions, and the attempted murder conviction, were reclassified under section 775.087(1), and the trial court also imposed four consecutive three-year minimum-mandatory sentences for the robbery, attempted murder, and two murder convictions (for possession of a firearm under 775.087(2)).
On appeal, and contrary to the majority’s assertion (see majority opinion at 919), the defendant in Junco did not argue, and this court in Junco did not address, the propriety of the reclassification of the two murder and one attempted murder offenses.[45] Junco did raise, and this court did address, whether the trial court could properly impose consecutive minimum-mandatory sentences for the robbery (at which Junco was present and in which he participated) and for the two murders and the attempted murder committed by co-defendants soon after Junco left the scene of the crime.
Junco contended that these crimes comprised a single criminal episode, thus requiring that the minimum mandatory sentences be imposed concurrently.[46] The state argued that the robbery and the murders were separate and distinct offenses and therefore authorized consecutive minimum mandatory sentences.[47] Junco has nothing to do with whether the defendant possessed a firearm “during the commission of’ the robbery or the murders. The issue was whether the crimes for which defendants were convicted were considered separate and distinct or a single criminal episode. This court held that, for purposes of imposing consecutive minimum mandatory sentences, the robbery and the murders, though they could be said to have occurred during a single criminal episode, were sufficiently separate in time so as to constitute two separate offenses. Id. at 913. Junco does not support the majority’s conclusion that the facts in the instant case constitute a “single criminal episode.” In Junco, the defendant went to a warehouse, armed with a firearm and accompanied by armed co-defendants, to commit a robbery. He participated actively in the robbery itself, and he fled the scene of the crime moments before his co-defendants murdered two people in the warehouse and attempted to murder a third person. This was a continuous, unbroken series of acts and events in which Junco was an active participant at a place and during the time the actual crimes were being committed. By contrast, the instant case involves a significant temporal break and spatial divide between Connolly’s act as aider and abettor in Bos *957 ton and the actual commission of the murder three weeks later in Miami.[48]
Indeed, there are cases which address the relevance of spatial and temporal proximity in assessing whether the use of a firearm occurs “during the commission of’ the offense. In Lemus v. State, 33 So.3d 774 (Fla. 4th DCA 2010), the defendant was convicted of, inter alia, two counts of aggravated assault (with a firearm) each committed on a different police deputy. The evidence at trial established the following:
— At about 8 a.m., police responded to an apartment after receiving a 911 call from defendant’s father.
— Ten minutes after their arrival, police heard a gunshot and SWAT officers were called to the scene. — Twenty to thirty minutes later, defendant came out of the apartment with a gun in his hand and, ignoring police commands to drop the gun, fired a shot into the ground and returned inside the apartment.
— At 9 a.m. SWAT officers heard more gunshots inside the apartment, and attempted to position themselves to see inside the apartment.
— Defendant’s standoff with police continued until about 4 p.m., when defendant came out of the apartment, pointed his gun at Deputy Brady (but did not discharge the gun), and retreated inside the apartment (the first aggravated assault).
— A short while later, defendant again came out of the apartment, pointed his gun at Deputy Davis (but did not discharge the gun) and again retreated inside the apartment (the second aggravated assault).
— Defendant later emerged from the apartment a final time and was arrested without further incident.
Applying section 775.087(2)(a)2. (the “10/20/Life” statute),[49] the trial court imposed a twenty-year minimum mandatory sentence for each of the aggravated assault convictions, finding that “during the course of the commission of’ the aggravated assaults, defendant discharged a firearm. The Fourth District reversed these minimum mandatory sentences. The court began by noting that the meaning of the term “during the course of the commission of the felony” is a question of statutory construction: “Principles of statutory construction require that the statute’s words be afforded their plain meaning, and, if there is any ambiguity, such ambiguity must be resolved in favor of the defendant (the rule of lenity).” Id. at 775. (citations omitted). The court then held that, applying these principles of statutory construction, the evidence could not sup *958 port a finding that the defendant discharged a firearm “during the course of the commission of’ the aggravated assaults:
The aggravated assaults were committed when the defendant, using a gun, threatened and placed in fear Deputies Brady and Davis. See §§ 784.011(1) (defining crime of assault), 784.021 (defining crime of aggravated assault), 784.07(2)(c) (defining crime of aggravated assault on a law enforcement officer). The State argues that the phrase “during the course of’ contained in section 775.087(2)(a)2. should be interpreted to mean any action occurring during the “temporal episode” surrounding the charged criminal offense. The State thus maintains that since Lemus fired a revolver while earlier engaged in the standoff, the weapon was fired during the “criminal episode ” of the aggravated assault offenses. We reject the State’s broad interpretation of the statute as contrary to both the plain meaning of the statute and the “rule of lenity.” The evidence at trial established that the defendant’s discharge of the firearm, by firing a shot into the ground, took place some seven hours pnor to his threatening Deputies Brady and Davis with a gun, i.e., the commission of the aggravated assaults. Indeed, there was no evidence that either Deputy Brady or Deputy Davis actually saw, or was aware of, the defendant firing a shot into the ground. Under the circumstances of this case, it cannot be said that the discharge of the firearm occurred “during the course of the commission” of either of the aggravated assault charges.
Id. at 776 (emphasis added).
Although Lemus involved the imposition of a minimum mandatory sentence under the 10/20/Life statute, it is nevertheless instructive. Lemus construes operative statutory language (“during the course of the commission of the felony”) that is very similar to that of the reclassification statute (“during the commission of’ the felony). The Lemus court held that the act of the defendant in discharging the firearm several hours before committing the aggravated assaults (by threatening the deputies with the firearm) could not reasonably be said to have occurred during the course of the commission of the aggravated assaults. The decision in Lemus underscores the relevance of spatial and temporal proximity in assessing whether one’s possession or use of a firearm occurred “during the commission of’ the offense. In the case before us, it is clear that Connolly’s carrying of the firearm was not related, in the episodic sense, to the commission of the murder.
The Fourth District later referenced and distinguished Lemus in a case in which the defendant discharged a firearm during a single continuous criminal episode. See Chavers v. State, 112 So.3d 594 (Fla. 4th DCA 2013). In doing so, the court in Chavers aptly described Lemus as involving “criminal episodes [which] were spatially and temporally distinct.” Id. at 595. In the instant case, as in Lemus, the acts of Connolly and the actual commission of the murder were spatially and temporally distinct. In the instant case, as in Lemus, there is no single continuous criminal episode which would permit a conclusion that Connolly’s carrying of a firearm occurred during the commission of the murder.
Finally, one cannot easily ignore this Court’s decision in Crimson v. State, 390 So.2d 152 (Fla. 3d DCA 1980).[50] In that case, Crimson lent his firearm to several *959 other individuals, knowing that this firearm would be used by them in committing an armed robbery. Crimson was convicted of armed robbery as a principal (aiding and abetting the armed robbery by providing co-defendants with the firearm used in the crime). The trial court’s sentence of Crimson included a three-year mandatory minimum term because Crimson was convicted of the robbery and had in his possession a firearm. See § 775.087(2), Fla. Stat. (1979).[51] On appeal, this court reversed the sentence, reasoning:
The three culprits who were at the scene of the crime, who did not handle the gun, could not have been given a three-year minimum sentence upon conviction of armed robbery. Therefore, we find it was error to give the appellant a three-year minimum sentence upon conviction, when he was not present at the scene.
Although Crimson involved imposition of a mandatory minimum sentence (rather than reclassification) the same principles are present. In fact, Crimson provides an even more compelling set of facts, given that the defendant supplied his co-defendants with the very same firearm that was used in the armed robbery. However, this was not deemed sufficient to warrant imposition of the three-year minimum mandatory, where Crimson himself was not present at the scene and thus did not actually possess any firearm during the commission of the crime.
Implicit in this holding is a recognition that Crimson’s possession of the firearm and lending it out, did not constitute the commencement of the armed robbery. Nor was Crimson’s possession of the firearm connected episodically with the actual commission of the crime, and therefore could not serve as a basis for the enhanced sentence. Applying the logic and reasoning of Crimson, Connolly’s act of aiding and abetting while carrying a firearm cannot support reclassification.

D. Conclusion

There can be little doubt that this is a hard case. But, as Justice John Harlan acknowledged more than a century ago, “it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law.” U.S. v. Clark, 96 U.S. 37, 49, 24 L.Ed. 696 (1877) (Harlan, J., dissenting) (quoting Lord Campbell in East India Co. v. Paul, 7 Moo. 85, 111 (P.C. 1840)). The law is as clear as our duty to apply it. Connolly did not carry a firearm “during the commission of’ the murder: His carrying of a firearm occurred during the episodically remote act of aiding and abetting a murder that was subsequently committed by others. While he is equally culpable as a principal for the second-degree murder committed by his co-principals, Connolly’s conviction cannot be reclassified to a life felony, and remains a felony of the first degree. Because prosecution for this first-degree felony was not commenced within four years after it was committed,[52] the conviction, judgment and sentence for second-degree murder are barred by the expiration of the statute of limitations.
I conclude therefore that we must reverse with directions to vacate the judgment and sentence and enter a judgment of acquittal. For these reasons, I respectfully concur in part and dissent in part.
*960 SUAREZ, C.J., and SHEPHERD and LAGOA, JJ., join in the dissent only and concur that we must reverse with directions to vacate the judgment and sentence and enter a judgment of acquittal.

. Because portions of the majority’s analysis in Part V and Part VII are intertwined with its discussion and analysis in Part VI, I also dissent from the overlapping portions of Parts V and VII.

. The issue of reclassification is dispositive because, without reclassification, the defendant's conviction as a principal to second-degree murder is a first-degree felony. At the time of this offens'e (1982), the statute of limitations for a first-degree felony was four years. See § 775.15(2)(a) Fla. Stat. (1982). The statute was subsequently amended and now provides that prosecution of a capital felony, a life felony or a "felony that resulted in death may be commenced at any time.” See § 775.15(1), Fla. Stat. (2015).

. The common law provided for different classifications of perpetrators depending on their level of participation in the offense. At common law, there existed principals in the first degree (those who actually commit the offense); principals in the second degree (those who are present, aiding and abetting at the commission of the offense); accessories before the fact (those who, though absent at the time of the commission of the felony, did procure, counsel, command, and abet another' to commit such felony); and accessories after the fact (those who, knowing a felony has been committed by another, thereafter receives or assists the felon). See generally, Potts v. State, 430 So.2d 900 (Fla.1982); Blackburn v. State, 314 So.2d 634 (Fla. 4th DCA 1975). In 1957, the Florida Legislature eliminated such distinctions (except for accessory after the fact, which still exists, see § 777.03, Fla. Stat. (1981); Staten v. State, 519 So.2d 622 (Fla.1988)). Under section 777.011, all participants who either commit the offense themselves, or who aid, abet counsel, hire or otherwise procure such offense to be committed by another, are all considered principals in the first degree and are equally criminally responsible for the acts of their co-principals. I do not dispute that Connolly is equally culpable, as a principal in the first degree, for the second-degree murder committed by the other co-principals. But that is decidedly not the issue here. Rather, the issue is whether that second-degree murder, for which Connolly is equally criminally culpable, can be reclassified to a life felony. This requires a separate determination of whether, under the facts of this case and the statutory language, Connolly carried a firearm "during the commission of” the second-degree murder.

. A statutory provision is not ambiguous if it is “ ‘plain to anyone reading the Act' that the statute encompasses the conduct at issue.” Salinas v. U.S., 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

. Other statutes utilize the phrase "during the commission of” the offense but similarly fail to include any definition. See, e.g., § 775.087(2)(a), Fla. Stat. (2015) (providing mandatory minimum sentences for persons who commit certain designated offenses and who "during the commission of the offense” actually possess a firearm or destructive device); § 784.07(3), Fla. Stat. (2015) (providing mandatory minimum sentence for any person who commits battery on a law enforcement officer and possessed a firearm "during the commission of the offense”); § 794.0115, Fla. Stat. (2015) (providing mandatory minimum sentence if the offender "used or threatened to use a deadly weapon during the commission of” certain designated offenses); § 810.09, Fla. Stat. (2015) (classifying trespass as a third-degree felony if the offender "is armed with a firearm or other dangerous weapon during the commission of the offense”); § 843.08, Fla. Stat. (reclassifying false personation of a law enforcement officer to a second-degree felony if the person "falsely personates any such officer during the course of the commission of a felony").

.Additionally, and as discussed infra at C.6, section 775.087(2)(a)2. (the 10/20/Life statute) uses a similar (but undefined) phrase in authorizing the imposition of minimum mandatory sentences where a firearm is discharged "during the course of the commission of” the felony.

. Even the majority agrees that the two phrases are synonymous, positing that the phrase "during the commission of” the crime should be defined as "at some time in the course of” the commission of the crime. See majority op. at 914. Unfortunately, the majority's analysis focuses on the words “at some time” (apparently equating it with an open-ended timeframe, untethered to time or place) and ignores the truly relevant portion: "in the course of,” which connotes an episodic relationship between the carrying of the firearm and the commission of the crime.

. § 932.701 provides in pertinent part:
(2) As used in the Florida Contraband Forfeiture Act:
(a) "Contraband article” means:
[[Image here]]
5. Any personal property, including, but not limited to, any vessel, aircraft, item, object, tool, substance, device, weapon, machine, vehicle of any kind, money, securities, books, records, research, negotiable instruments, or currency, which was used or was attempted to be used as an instrumentality in the commission of, or in aiding or abetting in the commission of, any felony, whether or not comprising an element of the felony, or which is acquired by proceeds obtained as a result of a violation of the Florida Contraband Forfeiture Act.
6. Any real property, including any right, title, leasehold, or other interest in the whole of any lot or tract of land, which was used, is being used, or was attempted to be used as an instrumentality in the commission of, or in aiding or abetting in the commission of, any felony, or which is acquired by proceeds ob-tamed as a result of a violation of the Florida Contraband Forfeiture Act.
[[Image here]]
12. Any personal property, including, but not limited to, any vehicle, item, object, tool, device, weapon, machine, money, security, book, or record, that is used or attempted to be used as an instrumentality in the commission of, or in aiding and abetting in the commission of, a person’s third or subsequent violation of s. 509.144, whether or not comprising an element of the offense. (Emphasis added.)

. § 831.033(l)(b) provides for the forfeiture of certain counterfeit property:
(b) Any personal property, including, but not limited to, any item, object, tool, machine, or vehicle of any kind, employed as an instrumentality in the commission of, or in aiding or abetting in the commission of, the crime of counterfeiting, as proscribed by ss. 831.OS-831.034, and not otherwise included in paragraph (a), may be seized and is subject to forfeiture pursuant to ss. 932.701-932.704.

. The standard jury instruction on principals, Fla. Std. J. Inst. (Crim.) 3.5(a), provides:
If the defendant helped another person or persons [commit] [attempt to commit] a crime, the defendant is a principal and must be treated as if [he] [she] had done all the things the other person or persons did if:
1. the defendant had a conscious intent that the criminal act be done and
2. the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually [commit] [attempt to commit] the crime.
To be a principal, the defendant does not have to be present when the crime is [committed] [or] [attempted],
(Emphasis added.)

. I discuss infra, at section C.6, the majority’s characterization of Connolly as an active co-perpetrator of the murder itself, rather than one whose equal culpability is as a principal who aided and abetted those who actually committed the murder. However, it is worth noting here that at no time during the pretrial, trial or post-trial proceedings below, or on appeal, has the State ever taken the position that Connolly’s culpability for the murder was as an active co-perpetrator who himself committed the murder. The State has always based its prosecution on a principal theory. The majority’s opinion on rehearing en banc marks the birth of this "active co-perpetrator” theory and, given that no party has ever raised or argued such a theory, appears to be the result of an immaculate conception.

. This conclusion does not impact the reclassification or enhancement of accomplices or aiders and abettors who are armed and actually or constructively present during the actual commission of the offense. Application of the reclassification statute under such circumstances is well-established and is unaffected by my analysis. See e.g., Junco v. State, 510 So.2d 909 (Fla. 3d DCA 1987); Gillis v. State, 486 So.2d 706 (Fla. 5th DCA 1986); Smith v. State, 438 So.2d 10 (Fla. 2d DCA 1983).

. The majority posits that the Legislature has expressed its intent that the maximum punishment be imposed for people who possess a firearm during the commission of criminal offenses, relying upon the legislative intent contained in section 27.366, Florida Statutes. See majority op. at 922-23. There are two flaws with this position: first, section 27.366 was enacted in 1999, eighteen years after John Callahan was murdered. Second, and as even the majority concedes, section 27.366, makes no reference whatsoever to the reclassification subsection (775.087(1)), limiting its expressed legislative intent to the minimum mandatory subsections of section 775.087 (§ 775.087(2) and (3)). As the majority asserts elsewhere in its opinion, we must presume that "the Legislature chose its words carefully when drafting” section 27.366.

. Notably, co-principal’s conviction may also be reclassified because "during the commission of” the second-degree murder, co-principal "carried” a firearm. This is so even if the actual murder was accomplished without anyone using or possessing a firearm.

. It seems appropriate to note here that I do not ascribe to any "last act” theory which the majority appears to assign to my dissent. I do not contend that because Connolly was not present for, and did not carry the firearm during, the very final act of the murder (i.e., the shooting of the firearm by a co-defendant) that he cannot be reclassified. To the contrary, so long as it can be said that he carried a firearm "during the commission of” the murder, he is subject to reclassification, whether the carrying of the firearm occurred at the beginning of the commission of the murder, or at the end of the commission of the murder, or at any time in between.

. I also include a discussion of the crime of solicitation, as it helps to further demonstrate why the majority’s analogy is misguided.

. It is the additional requirement of an overt act in furtherance that distinguishes the offenses of solicitation and conspiracy from the offense, of criminal attempt. Waskin, 481 So.2d at 494; State v. Johnson, 561 So.2d 1321 (Fla. 4th DCA 1990); Hutchinson v. State, 315 So.2d 546 (Fla. 2d DCA 1975).

. He was also convicted of possession with intent to deliver cocaine without a firearm, but that conviction is not relevant to this issue.

. The majority misses the point in asserting that the actual perpetrators of the crime, and aiders and abettors to the crime, are all now treated as principals under the law and may be charged, convicted and punished as such. See majority op. at 913. I have no quarrel with this accurate statement of the law, nor do I suggest that Connolly, who aided and abetted the crime, is in any way less culpable of the second-degree murder than those who actually committed the murder. But the issue at hand is not Connolly’s culpability for the second-degree murder; rather, it is whether his conviction for that charge, as a principal who aided and abetted (but who did not himself commit) the murder, can be reclassified to a higher degree because he carried a firearm during his remote act of aiding and abetting. It is in this context that there is a relevant purpose in distinguishing between principals whose culpability is direct (i.e., those who actually committed the crime) and principals whose culpability is indirect (i.e., those who aided and abetted the crime and are therefore equally criminally responsible for the acts of their co-principals).
Based upon the faulty premise that Connolly’s act is the "act of murder” (rather than the remote act of aiding and abetting the murder subsequently committed by others), the majority contends, in essence, that Connolly's culpability as principal was as an active perpetrator of the murder, therefore allowing for its ipso facto (but nevertheless wayward) conclusion that Connolly's carrying of the firearm occurred "during the commission of” the murder.

. Junco did claim that the robbery was improperly reclassified and we held that the trial court properly reclassified this offense "because Junco did actually participate in the criminal offense while in the possession of a firearm_” Id. at 913.

. The defendant in Junco relied for its argument upon Palmer v. State, 438 So.2d 1 (Fla.1983) and its progeny.

. The State in Junco relied for its argument upon State v. Enmund, 476 So.2d 165 (Fla.1985), State v. Thomas, 487 So.2d 1043 (Fla.1986), and Murray v. State, 491 So.2d 1120 (Fla.1986).

. The majority also relies upon Andrade v. State, 564 So.2d 238 (Fla. 3d DCA 1990). In Andrade, the defendant was convicted of seven separate counts (three counts of attempted murder, and one count each of first-degree murder, armed robbery, conspiracy to traffic in cocaine, and resisting arrest with violence). Without any recitation of the underlying facts, or the course of events that led to the commission of these crimes, we held in Andrade that "the trial court did not, as urged, commit reversible error in enhancing the defendant’s conviction on the three counts of attempted murder and in imposing three-year mandatory minimum sentences as to each of those convictions; this is so because the evidence establishes that the defendant possessed a firearm during the criminal episode in question." Id. at 239. Andrade does nothing to advance the majority's position.

. Section 775.087(2)(a)2. provides in pertinent part that any person who is convicted of a qualifying offense (including an aggravated assault) "and during the course of the commission of the felony such person discharged a 'firearm'... shall be sentenced to a minimum term of imprisonment of 20 years.”

. Neither party cited to this case during the initial briefing or during the supplemental briefing on rehearing en banc.

. In 1979, section 775.087(2)(a), Florida Statutes, read in relevant part: Any person who is convicted of: ... robbery ... and who had in his possession a "firearm”... shall be sentenced to a minimum term of imprisonment of 3 calendar years.

. See § 775.15(2)(a), Fla. Stat. (1981), which provided: "A prosecution for a felony of the first degree must be commenced within 4 years after it is committed.”